**CABELL v. MARKHAM, Alien Property Custodian, et al.**

No. 279.

Circuit Court of Appeals, Second Circuit.

April 3, 1945.

Writ of Certiorari Granted June 4, 1945.

See 65 S.Ct. 1415.

738

Hartwell Cabell, pro se and Charlton Og-
burn, both of New York City, for plaintiff-
appellant.

William L. Lynch, of New York City,
John F. X. McGohey, U. S. Atty., of New
York City, and Herbert Wechsler, Asst.
Atty. Gen., War Division, Department of
Justice (John Ernest Roe, Gen. Counsel to
Alien Property Custodian, of Madison,
Wis., of counsel), for defendants-appellees.

Before L. HAND, AUGUSTUS N.
HAND, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

This appeal depends upon the meaning of
a part of the proviso to § 9(e) of the Trad-
ing with the Enemy Act, as amended on
March 10, 1928, 50 U.S.C.A.Appendix, §
9(e), which we quote in the margin.[1] The
plaintiff filed a complaint under § 9(a) of
that act, alleging that he was a creditor of

an Italian insurance company, whose as-
sets in this country the predecessor in of-
fice of the defendant, Markham, had seized,
as Alien Property Custodian; and that he
had presented his claim in due form to the
Custodian, who refused to recognize it.
The defendants moved to dismiss the com-
plaint because of its insufficiency in law,
on the ground that the claim had not been
in existence before October 6, 1917, and
had not been filed before the date of the
enactment of the Settlement of War Claims
Act of 1928. The judge held that, since
both these facts appeared in the complaint,
the proviso of § 9(e) just quoted covered
the situation; and for this reason he dis-
missed the complaint.

█ When the Trading with the Enemy
Act was first passed on October 6, 1917,
it contained the substance of what is now
subdivision (a), but nothing more. It was
amended again and again, but subdivision
(e) was not added until 1920 (41 St. L.
980), though from the first it provided that
no debt should be paid which had not been
"owing" before October 6, 1917. The ad-
dition that the claim should be presented
before March 10, 1928, dates from the
amendment of that year (45 St.L. 271).
The statute was not re-enacted when the
present war broke out; nor was that nec-
essary, for it automatically went into ef-
fect again. This appears, for example,
from the definition of the phrase; "begin-
ning of the war," in § 2, 50 U.S.C.A.Ap-
pendix, § 2 ("the day on which Congress
has declared or shall declare war"); from
§ 302 of Title III of Chapter 593 of Laws
of the First Session of the 77th Congress,
55 St.L. p. 839, 50 U.S.C.A.Appendix, §
617, which assumes that it had not been in
force before December 8, 1941, and that it
went into effect again at once thereafter;
and because § 5(b) was amended without
mention of any other part. 55 St.L. 839,
840, 50 U.S.C.A.Appendix, § 616. For this
reason it seems proper for purposes of in-
terpretation to interpret it as though it had
been enacted on December 8, 1941, when
the present war was declared. Were that
literally the case, we should be faced with
a statute, subdivisions (a) and (e) of which

[1] "nor in any event shall a debt be al-
lowed under this section unless it was
owing to and owned by the claimant prior
to October 6, 1917, and as to claimants
other than citizens of the United States
unless it arose with reference to the mon-
ey or other property held by the Alien
Property Custodian or Treasurer of the
United States hereunder; nor shall a
debt be allowed under this section unless
notice of the claim has been filed, or ap-
plication therefor has been made, prior to
the date of the enactment of the Settle-
ment of War Claims Act of 1928."

flatly contradicted each other. Subdivision (a) provides that "any person * * * to whom any debt may be owing * * * may file * * * a notice of his claim * * * and the President * * * may order the payment * * * of the money * * * held." If the President does not order payment, the "said claimant may institute a suit in equity * * * to establish the * * * debt so claimed, and if so established the court shall order the payment * * * to which the * * * claimant is entitled." This language is mingled with that giving a remedy for property mistakenly seized, and it is unnecessary to labor the point that it was intended to put creditors upon an equal footing with owners. Indeed, although we assume it to be true that for constitutional purposes it was not necessary to allow the alien's creditors any recourse to the seized property, since the alien himself remains liable; for practical purposes there is little difference between debts and claims to property.

It is at least arguable that the whole of subdivision (e) is limited to seizures made during the first war. It begins with a provision that "a citizen or subject of any nation which was associated with the United States in the prosecution of the war" may recover his property or collect his debt only in case that nation gave reciprocal rights to citizens of the United States. The use of the preterite is significant, particularly when coupled with the word, "associate," which it will be remembered was chosen during the last war in sedulous avoidance of any implication that we had "allies." If this be true, it would be indeed unreasonable not to confine the proviso similarly: that is, to read it otherwise than as limited to seizures made during that war. If we do not so read it, the result is really nonsense, for the remedy given in subdivision (a), which is prospective, is completely defeated by subdivision (e). Nobody can seriously believe that a general plan designed to be successively suspended and revived, as peace and war should alternate, was meant to be permanently mutilated by a statute of limitation expressly made applicable to only the first of its phases. The defendants have no answer except to say that we are not free to depart from the literal meaning of the words, however transparent may be the resulting stultification of the scheme or plan as a whole.

Courts have not stood helpless in such situations; the decisions are legion in which they have refused to be bound by the letter, when it frustrates the patent purpose of the whole statute. We need cite no others than the more recent of those in the Supreme Court which have followed Rector, etc., of Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226; Pickett v. United States, 216 U.S. 456, 461, 30 S.Ct. 265, 54 L.Ed. 566; American Security & Trust Co. v. District of Columbia, 224 U.S. 491, 495, 32 S.Ct. 553, 56 L.Ed. 856; Takao Ozawa v. United States, 260 U.S. 178, 194, 43 S.Ct. 65, 67 L.Ed. 199; United States v. Katz, 271 U.S. 354, 362, 46 S.Ct. 513, 70 L.Ed. 986; Sorrells v. United States, 287 U.S. 435, 446-448, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249. See also United States v. Ryan, 284 U.S. 167, 175, 52 S.Ct. 65, 76 L.Ed. 224; Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, 305 U.S. 315, 333, 59 S.Ct. 191, 83 L.Ed. 195; and United States v. American Trucking Associations, 310 U.S. 534, 543, 544, 60 S.Ct. 1059, 84 L.Ed. 1345. As Holmes, J., said in a much-quoted passage from Johnson v. United States, 163 F. 30, 32, 18 L.R.A.,N.S., 1194: "it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before." See also Van Beeck v. Sabine Towing Co., 300 U.S. 342, 351, 57 S.Ct. 452, 81 L.Ed. 685; Keifer & Keifer v. Reconstruction Finance Corporation, 306 U.S. 381, 391, 59 S.Ct. 516, 83 L.Ed. 784; United States v. Hutcheson, 312 U.S. 219, 235, 61 S.Ct. 463, 85 L.Ed. 463. Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning. Since it is utterly apparent that the words of this proviso were intended to be limited to seizures made during the last war, and could not conceivably have been intended to apply to seizures made when another war revived the Act as a whole from its suspension, it does no undue violence to the lan-

guage to assume that it was implicitly subject to that condition which alone made the Act as a whole practicable of administration.

Judgment reversed.